POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUY BAHAT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MEI PHARMA, INC., DANIEL P. GOLD, and BRIAN G. DRAZBA,<br><br>Defendants. | Case No. **'20 CV 1543 WQH LL**<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Guy Bahat ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MEI Pharma, Inc. ("MEI Pharma" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired MEI Pharma securities between August 2, 2017 and July 1, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

1

Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     MEI Pharma was founded in 2000 and is based in San Diego, California.  The Company was formerly known as Marshall Edwards, Inc. and changed its name to MEI Pharma, Inc. in July 2012.  MEI Pharma is a late-stage pharmaceutical company that focuses on the development of various therapies for the treatment of cancer.  MEI Pharma's clinical drug candidates include, among others, Pracinostat, an oral histone deacetylase ("HDAC") inhibitor.

3.     MEI Pharma and Helsinn Healthcare SA, a Swiss pharmaceutical corporation ("Helsinn"), with which MEI Pharma had an exclusive worldwide license, development, manufacturing and commercialization agreement for Pracinostat in acute myeloid leukemia ("AML"), myelodysplastic syndrome, and other potential indications (the "Helsinn License Agreement"), were evaluating Pracinostat in, among other studies, a pivotal Phase 3 global registration clinical trial for the treatment of adults with newly diagnosed AML who are unfit to receive intensive chemotherapy (the "Phase 3 Pracinostat Trial").  The Phase 3 Pracinostat Trial, which was initiated in June 2017, was a randomized, double-blind, placebo-controlled study that would enroll worldwide approximately 500 adults with newly diagnosed AML who are unfit to receive intensive chemotherapy.  Patients were randomized 1:1 to receive Pracinostat or placebo with azacitidine as background therapy.  The primary endpoint of the trial was overall survival.

2

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) MEI Pharma had overstated Pracinostat's potential efficacy as an AML treatment for the target population; (ii) consequently, the Phase 3 Pracinostat Trial was unlikely to meet its primary endpoint of overall survival; (iii) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial condition and prospects for Pracinostat; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On July 2, 2020, during pre-market hours, MEI Pharma issued a press release announcing that it was discontinuing the Phase 3 Pracinostat Trial. Specifically, the Company advised that an interim futility analysis of the Phase 3 Pracinostat Trial, undertaken by the study's Independent Data Monitoring Committee ("IDMC"), "has demonstrated it was unlikely to meet the primary endpoint of overall survival compared to the control group," and that "[b]ased on the outcome of the interim analysis, the decision was made to discontinue the recruitment of patients and end the study," which "was based on a lack of efficacy and not on safety concerns."

6.     Following MEI Pharma's announcement, the Company's stock price fell $0.78 per share, or 18.27%, to close at $3.49 per share on July 2, 2020.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).   MEI Pharma is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

12.     Plaintiff, as set forth in the attached Certification, acquired MEI Pharma securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant MEI Pharma is a Delaware corporation with principal executive offices located at 11455 El Camino Real, Suite 250, San Diego, California 92130.     MEI Pharma's securities trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "MEIP."

14.     Defendant Daniel P. Gold ("Gold") has served as MEI Pharma's Chief Executive Officer ("CEO") at all relevant times.

15.     Defendant Brian G. Drazba ("Drazba") has served as MEI Pharma's Chief Financial Officer at all relevant times.

16.     Defendants Gold and Drazba are sometimes referred to herein as the "Individual Defendants."

17.     The Individual Defendants possessed the power and authority to control the contents of MEI Pharma's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of MEI Pharma's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with MEI Pharma, and their access to material information available to them but not to the

public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

18.   MEI Pharma and the Individual Defendants are sometimes collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## Background

19.   MEI Pharma was founded in 2000 and is based in San Diego, California.   The Company was formerly known as Marshall Edwards, Inc. and changed its name to MEI Pharma, Inc. in July 2012.   MEI Pharma is a late-stage pharmaceutical company that focuses on the development of various therapies for the treatment of cancer.   MEI Pharma's clinical drug candidates include, among others, Pracinostat, an oral HDAC inhibitor.

20.   In August 2016, MEI Pharma entered into an exclusive worldwide license, development, manufacturing and commercialization agreement with Helsinn for Pracinostat in AML, myelodysplastic syndrome, and other potential indications.   Under the terms of the Helsinn License Agreement, Helsinn was granted a worldwide exclusive license to develop, manufacture and commercialize Pracinostat.   As compensation for such grant of rights, MEI Pharma received

payments of $20.0 million. In addition, the Company is eligible to receive up to $444 million in potential regulatory and sales-based milestones, along with royalty payments on the net sales of Pracinostat.

21. MEI Pharma and Helsinn were evaluating Pracinostat in, among other studies, a pivotal Phase 3 global registration clinical trial for the treatment of adults with newly diagnosed AML who are unfit to receive intensive chemotherapy. The Phase 3 Pracinostat Trial, which was initiated in June 2017, was a randomized, double-blind, placebo-controlled study that would enroll worldwide approximately 500 adults with newly diagnosed AML who are unfit to receive intensive chemotherapy. Patients were randomized 1:1 to receive Pracinostat or placebo with azacitidine as background therapy. The primary endpoint of the trial was overall survival.

**Materially False and Misleading Statements Issued During the Class Period**

22. The Class Period begins on August 2, 2017, when MEI Pharma and Helsinn issued a joint press release announcing that the first patient had been dosed in the Phase 3 Pracinostat Trial (the "August 2017 Press Release"). That press release quoted Defendant Gold, who represented, in relevant part, that "[t]he initiation of [the Phase 3 Pracinostat Trial] is the culmination of diligent preparation in collaboration with [MEI Pharma's] partners at Helsinn," and that Defendants "believe that with the well-powered, rigorously designed Phase 3 study underway, pracinostat is now one pivotal step closer to serving" those suffering from AML.

The August 2017 Press Release also quoted Riccardo Braglia, Helsinn Group Vice Chairman and CEO, who touted, in relevant part, "the potential of pracinostat, which was demonstrated in the Phase 2 study," and that Helsinn is "very pleased that pracinostat is moving into Phase 3, showing the continued momentum of the clinical programme."

23.     On September 5, 2017, MEI Pharma filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fourth quarter and full fiscal year ended June 30, 2017 (the "2017 10-K"). The 2017 10-K touted, in relevant part, that "Pracinostat is an orally available, potent HDAC inhibitor with potentially improved physicochemical, pharmaceutical and pharmacokinetic properties when compared to other compounds of this class"—such as other HDACs approved by the U.S. Food and Drug Administration ("FDA") for treating similar, blood-based cancers, which the 2017 10-K referenced in the same discussion—"including increased bioavailability and increased half-life"; and that the FDA's "Breakthrough Therapy Designation [for Pracinostat] is supported by data from a Phase II study of Pracinostat plus azacitidine in elderly patients with newly diagnosed AML who are not candidates for induction chemotherapy," which "showed a median overall survival of 19.1 months" that "compare[d] favorably to a recent international Phase III study of azacitidine . . . which showed a median overall survival of 10.4 months with azacitidine alone . . . in a similar patient population."

24.     In addition to touting the "potency" of Pracinostat, and the median overall survival of patients observed in the Phase 2 trial of Pracinostat with azacytidine, the 2017 10-K also provided generic, boilerplate representations related to how "[t]he results of pre-clinical studies and completed clinical trials are not necessarily predictive of future results," and that MEI Pharma's "current drug candidates may not have favorable results in later studies or trials."  For example, the 2017 10-K represented, in relevant part, that "[p]re-clinical studies and Phase I and Phase II clinical trials are not primarily designed to test the efficacy of a drug candidate, but rather to test safety, to study pharmacokinetics and pharmacodynamics, and to understand the drug candidate's side effects at various doses and schedules"; that "[f]avorable results in early studies or trials may not be repeated in later studies or trials, including ongoing pre-clinical studies and large-scale Phase III clinical trials"; that the Company's "drug candidates in later-stage trials may fail to show desired safety and efficacy despite having progressed through earlier-stage trials"; that "[u]nfavorable results from ongoing pre-clinical studies or clinical trials could result in delays, modifications or abandonment of ongoing or future clinical trials, or abandonment of a clinical program"; that "[p]re-clinical and clinical results are frequently susceptible to varying interpretations that may delay, limit or prevent regulatory approvals or commercialization"; and that "[n]egative or inconclusive results or adverse medical events during a clinical trial could cause a clinical trial to be delayed, repeated or terminated, or a clinical program to be

9

abandoned." Plainly, the foregoing risk warnings were generic "catch-all" provisions that were not tailored to MEI Pharma's actual known risks with respect to Pracinostat's efficacy, or lack thereof.

25.    Appended as an exhibit to the 2017 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2017 10-K "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended, and that the information contained in such report fairly presents, in all material respects, the financial condition and results of operations of MEI Pharma."

26.    That same day, MEI Pharma hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the fourth quarter and full fiscal year of 2017. During that call, Defendant Gold touted, in relevant part, the purportedly "diligent preparation" for the Phase 3 Pracinostat Trial, representing that "[t]his pivotal" study "is a well powered rigorously designed study," and that Defendants "look forward to tracking [the] progress [of the Phase 3 Pracinostat Trial] in the months ahead."

27.    On August 30, 2018, MEI Pharma filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fourth quarter and full fiscal year ended June 30, 2018 (the "2018 10-K"). The 2018 10-K contained substantively the same statements as referenced in ¶¶ 23-24, *supra*, which touted the "potency" of Pracinostat, and the median overall survival of

patients observed in the Phase 2 trial of Pracinostat with azacytidine; and which provided boilerplate representations related to how prior clinical studies' results were not necessarily indicative of future clinical studies' results, which were plainly generic "catch-all" provisions that were not tailored to MEI Pharma's actual known risks with respect to Pracinostat's efficacy, or lack thereof.

28.     Appended as an exhibit to the 2018 10-K were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

29.     That same day, MEI Pharma hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the fourth quarter and full fiscal year of 2018. During that call, Defendant Gold touted the Company's selective process for identifying and advancing drug candidates with promising financial and medical prospects, including Pracinostat. For example, Gold represented that, "at MEI [Pharma], [Defendants] strive to carry out a straightforward, purposeful strategy to build value in [the Company's] oncology portfolio for [their] stakeholders, and importantly, to deliver patient benefit beyond what is currently achieved through existing therapies"; that Defendants "choose drug candidates deliberately to address a clear deficiency in current treatment paradigms"; that MEI Pharma's "clinical programs are focused on effectively and efficiently validating therapeutic utility to address these deficiencies"; that Defendants "are also very mindful of how [they] deploy [their] resources so as to create a return on [their] investments, including decisions to advance and commercialize drug candidates

11

independently or via partnership to strategically and optimally build value"; that "[t]his strategy has successfully guided the identification and development of the 4 clinical-stage candidates in [the Company's] pipeline"; and that "[a]n example of the implementation of this model is [MEI Pharma's] most advanced candidate, pracinostat, which . . . is currently in a global Phase III registration study."

30.    On February 14, 2019, MEI Pharma issued a press release announcing "the publication [of] . . . the results from a Phase II study that evaluated the safety and efficacy of pracinostat . . . in combination with azacitidine, for the treatment of patients suffering from [AML], who cannot undergo treatment with intensive chemotherapy" (the "February 2019 Press Release").  That press release represented, in relevant part, that "[t]his investigational study showed that pracinostat in combination with azacitidine is active in the frontline treatment of older patients with AML, unfit for intensive therapy"; that "the median overall survival (OS) of 19.1 months, a PFS of 12.6 months and 1-year OS rate of 62% have been evidenced in patients unfit for intensive therapy"; that "[t]hese data have shown that pracinostat in combination with azacitidine is a potential treatment option for the frontline treatment of older AML patients unfit for [intensive chemotherapy]"; and that, "[b]ased on these results, a Phase III, multicenter, double-blind, randomized study of pracinostat with azacitidine vs placebo with azacitidine (NCT03151408) is ongoing to demonstrate an improvement of pracinostat  in combination in this difficult-to-treat AML population."

31.   The February 2019 Press Release also quoted various purported medical and/or scientific experts that attested to Pracinostat's potential to treat patients with AML who are unfit to receive intensive chemotherapy.  For example, that press release quoted Dr. Guillermo Garcia-Manero, MD Professor, Department of Leukemia, at MD Anderson Cancer Center in Houston, Texas, U.S., who touted "the encouraging results of this Phase II study . . . the data [of which] is highly encouraging for older patients suffering from [AML], and who cannot be treated with intensive chemotherapy," and that they "look forward to continuing with [their] ongoing Phase III study with pacinostat [*sic*] to show improvement of the pracinostat combination vs azacitidine with placebo, in this difficult-to-treat AML patients population."

32.   Additionally, the February 2019 Press Release quoted Sergio Cantoreggi, PhD, Chief Scientific Officer and Helsinn Group Head of R&D, who represented, in relevant part, that "[t]he publication of this data . . . shows  the potential of pracinostat  in combination with azacitidine as a[n] . . . effective regimen for difficult-to-treat AML patients," and that he and Defendants "are committed to further investigate the effects of this drug combination in an ongoing Phase III study."

33.   Finally, the February 2019 Press Release quoted Richard Ghalie, M.D., Senior Vice President, Clinical Development at MEI Pharma, who represented, in relevant part, that "[t]his Phase II study provided the rationale for [the] ongoing

13

Phase III study and show [*sic*] the potential for pracinostat, in combination with azacytidine, as a treatment option in this AML population."

34.     On August 28, 2019, MEI Pharma filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fourth quarter and full year ended June 30, 2019 (the "2019 10-K"). The 2019 10-K contained substantively the same statements as referenced in ¶¶ 23-25, *supra*, which touted the "potency" of Pracinostat, and the median overall survival of patients observed in the Phase 2 trial of Pracinostat with azacytidine; and which provided boilerplate representations related to how prior clinical studies' results were not necessarily indicative of future clinical studies' results, which were plainly generic "catch-all" provisions that were not tailored to MEI Pharma's actual known risks with respect to Pracinostat's efficacy, or lack thereof.

35.     Appended as an exhibit to the 2019 10-K were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

36.     The statements referenced in ¶¶ 22-35 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) MEI Pharma had overstated Pracinostat's potential efficacy as an AML treatment for the target population; (ii) consequently, the Phase 3 Pracinostat Trial was unlikely to meet its primary endpoint

of overall survival; (iii) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial condition and prospects for Pracinostat; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

37.     On July 2, 2020, during pre-market hours, MEI Pharma issued a press release announcing that it was discontinuing the Phase 3 Pracinostat Trial. Specifically, that press release stated, in relevant part:

> Helsinn, a Swiss pharmaceutical group focused on building quality cancer care and rare diseases products, and MEI Pharma, Inc. (Nasdaq: MEIP), a late-stage pharmaceutical company focused on advancing potential new therapies for cancer, today announce that an interim futility analysis of the ongoing Phase 3 study of pracinostat in combination with azacitidine in patients with AML who are unfit to receive standard intensive chemotherapy, undertaken by the study [IDMC], has demonstrated it was unlikely to meet the primary endpoint of overall survival compared to the control group. Based on the outcome of the interim analysis, the decision was made to discontinue the recruitment of patients and end the study. The decision was based on a lack of efficacy and not on safety concerns. Pending further evaluation, patients currently enrolled in other pracinostat studies will continue treatment.

38.     Following MEI Pharma's announcement, the Company's stock price fell $0.78 per share, or 18.27%, to close at $3.49 per share on July 2, 2020.

39.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.　Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired MEI Pharma securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.　The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MEI Pharma securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MEI Pharma or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.　Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

16

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MEI Pharma;

- whether the Individual Defendants caused MEI Pharma to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of MEI Pharma securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- MEI Pharma securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold MEI Pharma securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

47. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as

18

Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

49.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MEI Pharma securities; and (iii) cause Plaintiff and

19

other members of the Class to purchase or otherwise acquire MEI Pharma securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

52.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MEI Pharma securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MEI Pharma's finances and business prospects.

53.     By virtue of their positions at MEI Pharma, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each

Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of MEI Pharma, the Individual Defendants had knowledge of the details of MEI Pharma's internal affairs.

55.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of MEI Pharma.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MEI Pharma's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of MEI Pharma securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning MEI Pharma's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired MEI Pharma securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

21

56.     During the Class Period, MEI Pharma securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of MEI Pharma securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of MEI Pharma securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of MEI Pharma securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

57.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during

22

the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

59.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.     During the Class Period, the Individual Defendants participated in the operation and management of MEI Pharma, and conducted and participated, directly and indirectly, in the conduct of MEI Pharma's business affairs.  Because of their senior positions, they knew the adverse non-public information about MEI Pharma's misstatement of income and expenses and false financial statements.

61.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MEI Pharma's financial condition and results of operations, and to correct promptly any public statements issued by MEI Pharma which had become materially false or misleading.

62.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MEI Pharma disseminated in the marketplace during the Class Period concerning MEI Pharma's results of operations.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MEI Pharma to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of MEI Pharma within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MEI Pharma securities.

63.    Each of the Individual Defendants, therefore, acted as a controlling person of MEI Pharma.  By reason of their senior management positions and/or being directors of MEI Pharma, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, MEI Pharma to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of MEI Pharma and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

64.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MEI Pharma.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

24

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 10, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)

25

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

26